## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| JASON KLINTWORTH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     Case No. 20-CV-0178-CVE-CDL |
| | ) |
| VALLEY FORGE INSURANCE COMPANY, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Before the Court are cross-motions for summary judgment by the remaining parties in this action.[1]  Defendant Valley Forge Insurance Company's motion seeks summary judgment as to plaintiff Jason Klintworth's remaining claim for breach of the duty of good faith and fair dealing (bad faith) (Dkt. # 90).  In its motion, defendant argues plaintiff cannot satisfy the required elements of his bad faith claim because i) any delays in the claims process were either attributable to plaintiff or due to defendant's reliance on Oklahoma legal counsel, ii) there was a legitimate dispute among the parties as to the appropriate amount due to plaintiff, and iii) there is no evidence of inadequate investigation.   Plaintiff responds (Dkt. # 104) that defendant's bad faith is not excused by "unfounded" claims about a legitimate dispute and that defendant failed to investigate plaintiff's claim.  The motion is fully briefed (Dkt. ## 90, 104, 125).

In his motion for partial summary judgment (Dkt. # 107), plaintiff argues that defendant's claims handling process was conducted in bad faith, for which he is entitled to partial summary judgment.  First, he argues he is entitled to summary judgment because defendant failed to timely

---

[1]      Several parties have been dismissed.  The procedural history is detailed in this Court's June 29, 2020 opinion and order (Dkt. # 72).

disclose coverage to plaintiff.  Second, plaintiff asserts that defendant failed to investigate, evaluate, pay, or deny i) plaintiff's claim of loss of earning capacity; ii) plaintiff's claim of mental damages; and iii) plaintiff's claim for "the foreseeability" of plaintiff's diabetes-related hospitalization expenses.  Third, he argues he is entitled to summary judgment because defendant failed to investigate, but denied as unrelated to the accident, iv) plaintiff's claim for right shoulder injury; v) plaintiff's claim for the permanency of his left shoulder injury, various sprains and strains, and tinnitus; and vi) plaintiff's future medical expenses.  Dkt. # 107 at 6-7.  Fourth, plaintiff argues defendant acted in bad faith by unreasonably delaying investigation for nine months.  Id. at 7.  Fifth, plaintiff asserts defendant engaged in bad faith regarding defendant's retention of attorneys, stating it was bad faith to "retain[] an attorney outside the parameters of the policy," use an attorney to "develop[] a conflict of interest with plaintiff," and "limit[] the representation of plaintiff" without plaintiff's knowledge.  Id. at 7-8.  Sixth, plaintiff argues that defendant acted in bad faith when it capped plaintiff's non-economic damages at $350,000.  Id. at 8.  Seventh, and finally, plaintiff argues that failing to continue to investigate plaintiff's claims after the suit was filed constitutes bad faith. Id.  Defendant responds that none of the arguments raised in plaintiff's motion establishes bad faith as to delay or failure to investigate (Dkt. # 128).  The motion is fully briefed (Dkt. ## 107, 128, 142).

## I.

### A. Accident and Initial Claims Handling

On March 9, 2016, plaintiff was involved in a three-car collision.  Plaintiff was driving and had slowed due to highway congestion; he was subsequently struck by the vehicle directly behind him, driven by Linda Cervantes.  Dkt. # 90-16, at 14.  According to the police report, a third car, driven by DeMarco Metoyer, struck Cervantes's car and caused her car to strike plaintiff's car a

second time.  Id.  The passenger in Metoyer's car died at the scene.  Id. at 12.  And, though Cervantes survived the crash, she later died as a result of the injuries she sustained.  Plaintiff did not report any injuries to the police officers at the scene.  Dkt. # 90-1, at 5.

At the time of the accident, plaintiff's business, ALK Enterprises, LLC (ALK), was insured under a Business Auto Policy issued by defendant.  Dkt. # 90-2.  The policy covers collision claims for insured vehicles, and includes auto medical pay ("medpay") limits of $2,000, and uninsured motorist ("UIM") limits of $1,000,000.  Id. at 4-6.  The "Business Auto Conditions" subsection of the "Business Auto Coverage Form" section of the policy provides that

> [i]n the event of "accident", claim, "suit" or "loss", you must give us or our authorized representative prompt notice of the "accident" or "loss.'  Include:
>
> > (1) How, when, and where the "accident" or "loss" occurred;
> >
> > (2) the "insured's" name and address; and
> >
> > (3) to the extent possible, the names and addressed of any injured persons and witnesses.

Id. at 23.

The "Oklahoma Uninsured Motorists Coverage" endorsement to the policy provides that defendant "will pay, in accordance with Title 36, Oklahoma Statutes, all sums the 'insured' is legally entitled to recover as compensatory damages from the owner or driver of an 'uninsured motor vehicle.'"  Id. at 32.  The endorsement further states that payment will be made "under this coverage only if . . . a. [t]he limit of any applicable liability bonds or policies has been exhausted by payment of judgments or settlements; or b. a tentative settlement has been made between an 'insured' and the insurer of [an underinsured vehicle] . . . and we (1) have been given prompt written notice of such

tentative settlement; and (2) [a]dvance payment to the 'insured' in an amount equal to the tentative

settlement within 30 days after receipt of the notification." Id.  The policy also states:

> c. A person seeking Uninsured Motorist coverage must also notify us, in writing, of a tentative settlement between the "insured" and the insurer of an "uninsured motor vehicle" and allow us 60 days to advance payment in an amount equal to the tentative settlement to preserve our rights against the insurer, owner or operator of such "uninsured motor vehicle." This notice must be sent by certified mail and must include:
>
>> (1) Written documentation of economic losses;
>>
>> (2) Copies of all medical bills; and
>>
>> (3) Written authorization or a court order allowing us to obtain reports from any employers and medical providers.

Id. at 34.[2]

Shortly after the accident, plaintiff called his insurance agent, Mark Tedford of Tedford

Insurance, to discuss coverage.  Dkt. ## 107, at 13; 128, at 8.  On March 10, 2016, Tedford sent an

"Automobile Notice of Loss" form to defendant.  Dkt. # 107-1, at 1.  The form noted there had been

a three-car accident, that plaintiff was in the foremost vehicle, and that one person had died in the

crash.  Id. at 1.  The form stated that ALK was the insured and that plaintiff was the primary contact.

Id.

On March 11, 2016, defendant sent an "Acknowledgment of New Claim" letter to plaintiff,

which identified ALK's auto-insurance policy number, and assigned an identification number to the

claim.  Dkt. # 107-6.  Defendant was listed as the underwriting company.  Id.  The letter stated the

---

[2]     The policy also has a contract clause that establishes the insurer's duty to defend and indemnify its insured (Dkt. # 90-2, at 17); however, as no suit was ever filed against plaintiff, the provision is irrelevant to these motions.  No provisions in the contract limit defendant's ability to offer to provide legal counsel to the insured at insurer's expense.

type of claim as "auto," and included the contact information of the claims consultant in charge of the claim: J.W. "Dub" Graham.  Id.[3]  Graham interviewed plaintiff that day.  Dkt. ## 107, at 14; 128, at 9.  The interview was not recorded, but a claim note was made in defendant's internal log system. Dkt. ## 107, at 14; 128, at 9.  In the interview, Graham learned that plaintiff had been to a doctor after the crash and was possibly injured.  Dkt. ## 107, at 15; 128, at 9.  Plaintiff told Graham he would be going back to see the doctor.  Dkt. ## 107, at 15; 128, at 9.  After the call, Graham determined that plaintiff was not at fault in the accident.  Dkt. ## 107, at 15; 128, at 9.  Later that day, Graham sent an email to plaintiff regarding the call.  Dkt. # 128-13.  In the email, Graham states "[a]s discussed I am hiring defense counsel just as a precautionary measure for any possible future litigation. As soon as I get the name of who will handle I will advise you."  Id. at 1.  Shortly after that, Graham sent a follow up email stating that the "defense attorney assigned is Jim Secrest" of Secrest, Hill, Butler & Secrest.  Id. at 2.

Plaintiff's initial doctor visit on March 11, 2016 was with Dr. Paul Harris, D.C., of Harris Chiropractic Clinic.  Dkt. # 90-13, at 119.  Plaintiff indicated that on that day he was experiencing diabetes, depression, pain in both hands, headache, low back pain, neck pain, pain in the upper arm or elbow, pain in the upper leg or hip, swelling and stiffness of joints, tinnitus, visual disturbances, and wrist pain.  Id.  Dr. Harris advised plaintiff he should get MRIs of several areas.

On March 14, 2016, plaintiff spoke to a lawyer with the firm hired to defend plaintiff, Secrest, Hill, Butler & Secrest.  Dkt. # 128-16.  The lawyer, James Daniel, followed up with plaintiff

---

[3]     Defendant issued a check for the auto claim on March 16, 2016 for the estimated cost of the repairs ($5,545.66), less the deductible.  Dkt. # 90-5, at 39.  Defendant's claim notes reflect this was done because plaintiff indicated that Allstate, Cervantes's insurer, might not pay 100% of the repair bill.  Id. at 47.

5

on March 15, 2016.  Id.  Daniel stated he was in touch with plaintiff's adjuster at CNA.[4]  Id.  Daniel also requested that plaintiff request a redaction of certain false information relating to the March 9 accident that was published in The Tulsa World.  Id.

On March 25, 2016, plaintiff underwent MRIs of his left shoulder, lumbar spine, and cervical spine.  Dkt. # 90-13, at 94, 102, 104. The MRI report of the left shoulder states the clinical impression was that there was "mild tendinosis" and a series of abnormalities "possibly representing symptomatic bursitis."  Id. at 107.  The MRI reports of both the lumbar and cervical spine state that the impression was "multilevel degenerative disc disease."  Id. at 103, 105.

On April 1, 2016 plaintiff visited an orthopedic doctor for his "left shoulder pain."  The doctor reviewed the shoulder MRI and prescribed home exercise and 500mg NSAID as treatment, as well as a shoulder injection.  Id. at 7-8.  Plaintiff reported some relief from the injection.  Id. at 8.

On April 13, 2016, plaintiff emailed Graham stating that "after speaking with several people it has come to my attention that I could get some financial relief by tapping into my uninsured motorist coverage.  Could you help me in directing me as to with whom to speak."  Dkt. # 104-8, at 2.  However, Graham testified that he never saw this email, and that it was directed into a sub-folder of his mailbox.  Dkt. # 90-6, at 11.  On April 14, 2016, defendant's claim notes indicate a medpay claim was opened. Dkt. # 90-5, at 34.

On May 3, 2016, plaintiff visited a doctor for tinnitus.  That doctor noted that "[h]e did suffer whiplash injury and possible concussion."  Dkt. # 90-13, at 79.  She noted he complained of constant buzzing in both ears that had been waking him up at night.  In her "assessment and plan," she stated

---

[4]        CNA is a group of insurance companies of which defendant is a member. Dkt. # 90-15.

plaintiff's "ear examination is normal" with "mild high frequency sensorneural hearing loss that may be contributing to the tinnitus as well as possible concussion from the accident." Id. at 81.  She discussed salt and caffeine avoidance with plaintiff, and stated "hopefully over time this will show improvement if it is post-concussive." Id.  She said plaintiff planned to "look up Arches Tinnintus Formula on-line to see if he is interested in possible treatment." Id.

On May 6, 2016, plaintiff returned to his orthopedic doctor for a follow up visit regarding his left shoulder pain.  Id. at 9-11.  The doctor continued to prescribe home exercise and administered another injection to plaintiff's shoulder.  Id. at 11.

On May 11, 2016, in the midst of seeking treatment for his various injuries, plaintiff sent an email to his employees at ALK with the subject line: "Reduction in Staff due to the current economy."  This email stated ALK would "reduce the staff considerably due to the current environment," but that it was "still bidding on projects."[5]  Dkt. # 90-34.

On June 14, 2016, plaintiff returned to his orthopedic doctor for a third visit regarding his left shoulder.  Dkt. # 90-13, at 12.  The doctor prescribed a specific chair to assist with physical therapy, and also recommended left shoulder arthoscopy.  Id. at 15.  On June 23, 2016, plaintiff underwent surgery to relieve the pain in his left shoulder.  Id. at 24.  The resulting bills from Oklahoma Surgical Hospital totaled $17,482.  Id. at 3.

On June 15, 2016, just after plaintiff's shoulder surgery was recommended, plaintiff's attorney, Adam Weintraub, sent a letter on behalf of plaintiff to Adam Schmidt, a claims representative in CNA's Chicago office.  Dkt. # 90-8.  The letter stated Weintraub had been retained

---

[5]     While the email indicates an effort to continue the business, in his examination under oath, plaintiff stated that he "shut the company down in May." Dkt. # 90-26 at 20; see also id. at 45 (plaintiff states his "final decision" to shutdown was in May 2016).

7

to represent plaintiff regarding the March 9 accident.  Id.  The letter requested Schmidt "advise of any UM/Med pay coverage available."  Id.  On July 7, 2016, Weintraub sent a second letter to Schmidt in the CNA Chicago office.  Dkt. # 90-10.  In the letter, Weintraub reiterated that he had been retained to represent plaintiff, and added that he had filed a petition against Metoyer in Tulsa County court relating to the accident, and enclosed a copy of the petition.  Id.  Weintraub stated he believed Metoyer "to be without liability coverage," and asked that Schmidt "consider these claims under [plaintiff's] UM/Medpay coverage."  Id.

On July 8, 2016, plaintiff saw his orthopedic doctor for a post-operative visit.  Dkt. # 90-13, at 15.  The doctor's notes indicate plaintiff's shoulder was in moderate pain.  Id.  The doctor prescribed opiates for pain relief.  Id. at 16.

On July 13, 2016, Graham responded to Weintraub's June 15 letter via email.  Dkt. # 90-9. He advised Weintraub:

> there is UM coverage on [plaintiff's] policy but it is my understanding the two vehicles that struck [plaintiff's] vehicle, and are at fault, had liability coverage provided that would compensate for his injury/damages.  It appears there may be an issue between them on who is liable for his injury and damages.

Id.  Graham also noted that there was "medpay" coverage and directed Weintraub to the person responsible for that claim (whom he also copied on the email) for further communication.  Id.  He stated that it appeared $4,673 of $5,000 coverage had been paid.  Id.

On July 14, 2016, Daniel, the attorney at the firm hired to defend plaintiff against any potential liability, emailed Graham notifying him that plaintiff had received a notice of deposition in a matter arising out of the March 9 crash, and that plaintiff had sent it to Daniel that day.  Dkt. # 125-5, at 3.  Daniel asked to confer with Graham at his earliest convenience.  Id.  He copied plaintiff.

That same day, plaintiff was admitted to the intensive care unit of Saint Francis Hospital for excessive vomiting.  Dkt. # 90-13, at 165.  The records indicate plaintiff had stopped taking his diabetes medications before his shoulder surgery and never resumed them, meaning that he had been off of his medications for three weeks.  Id. at 165, 171.  He was diagnosed with diabetic ketoacidosis and sepsis.  Id. at 171, 172.  Plaintiff's conditions were treated and, on July 17, 2016, he was discharged from the hospital.  Id.  Plaintiff's hospital bill totaled $15,676.08.  Id. at 4.

On July 19, 2016, in an internal email regarding the March 9 accident, Daniel stated "with regard to the issue of [Metoyer] not having insurance, Mr. Weintraub . . . responded that he was incorrect." Dkt. # 90-11.  The letter continued that "Metoyer does have insurance, but [Weintraub] believes that it is only a policy for $25,000.00.  Regarding the issue of making a claim against the UM policy, our insured, according to Weintraub, has not necessarily made a claim against his UM, but wanted to ensure that you know what was 'going on' and that he may do so."  Id.  Daniel also stated that plaintiff had been subpoenaed in a matter ancillary to the accident.  The exchange stated that "there are two subpoenas out, one is for documents/photos that are in the possession of our insured, and the other is requesting records."  Id.  Finally, Daniel noted that he was going to attend one of the depositions of plaintiff the following day.  Id.

On July 22, 2016, plaintiff had second post-operative visit with his orthopedic doctor, wherein he stated he was experiencing moderate pain in his left shoulder.  Dkt. # 90-13, at 17.  The doctor noted that there was no evidence of swelling.  In this visit, plaintiff also "complain[ed] of numbness in his index and long fingers" that caused problems "tying his shoes and gripping items with his right hand."  Id.  The note states that "[h]is symptoms started in June 2016, about a week

after his left shoulder surgery." Id.  The doctor ordered an "EMG/Nerve Condition Study" of the right upper extremity. Id. at 19.

On July 27, 2016, Daniel wrote to Graham, updating him on the deposition that had been taken of plaintiff in the ancillary matter.  As relevant here, Daniel noted:

> Our goal is to prevent [plaintiff] from having to attend any further depositions regarding this accident unless he is directly sued. [Plaintiff] was not passed as a witness which, I believe, would have allowed us to cross-examine him to correct or refresh his recollection to several items, i.e., counsel's suggestion that he should have had his "flashers on" while he was waiting to enter the exit lane and [plaintiff's] response that he wished he would have done that. I objected to that section of questions in that it was foolish to assume that when one has their brakes engaged, as well as a turn signal flashing in a long line of cars, that any reasonable prudent person would realize traffic was backed up.

Dkt. # 125-5, at 1.  Daniel noted that Weintraub did not attend the deposition.  Daniel also stated that he and plaintiff gathered the materials for responding to the subpoena duces tecum.  Id.

On August 15, 2016, Daniel updated Graham on the status of the ancillary matter from mid-July, and added that plaintiff had also been subpoenaed in a second ancillary matter arising out of the March 9 crash.  Id. at 4.  Daniel explained that he accompanied plaintiff to hearings on both ancillary matters.  In that letter, Daniel explained that plaintiff did not testify at either hearing, but stated that "we would be remiss in not attending the hearings when reset as they will continue to 'hound' [plaintiff] in an attempt to place blame on him for the motor vehicle accident."  Id. at 4-5. He continued, stating "I spoke with [Weintraub] who agrees with me that we both should be kept abreast on the legal wrangling of all parties, as [plaintiff] is a primary witness to the motor vehicle accident and was also injured."  Id. at 5.

On August 30, 2016, plaintiff returned to the orthopedic doctor's office to review the results of his EMG test to his right arm.  Dkt. # 90-13, at 20.  In the doctor's review of the EMG, he noted

plaintiff's results were "consistent with diabetic peripheral neuropathy . . ." and consistent with both carpal and cubital tunnel syndrome.  Id. at 22.  The notes also state that  plaintiff's "shoulder was pain free until he fell earlier this month and landed on his left side," and he was now experiencing moderate pain.  Id. at 20.

On September 23, 2016, Daniel wrote to Graham again, providing updates on both ancillary matters, including that plaintiff had been subpoenaed again.  Dkt. # 125-5, at 6.  He stated that he believed the legal maneuvering was an attempt to include plaintiff in a lawsuit as "to eventually sue the parties for wrongful death naming the carrier with the most coverage in this case."  Id.  He concluded that he should attend the upcoming hearings regarding the ancillary matters as he "anticipate[s] [plaintiff] will continue to be called in these cases."  Id. at 7.  On September 27, 2016, Daniel wrote to Graham updating him on the status of the ancillary matters.  He also wrote to Weintraub, detailing the hearings he attended, to the extent allowed, and alerting him to the final hearing in one of the matters.  Id. at 10.  On October 6, 2016, Daniel attended a final hearing on one of the ancillary matters and determined that plaintiff had not been called to testify; he alerted Graham to that development in a letter later that day.  Id. at 12.

### B. UIM Demand and Investigation

On November 29, 2016, Weintraub mailed a demand package to Schmidt in CNA's Chicago office ("November 29 demand").  Dkt. # 90-13.  The cover letter stated that the attached documents included "a compilation of damages and records verifying the injury and claims of [plaintiff]. These documents are for your review and consideration of our resolution demand."  Id.  The cover letter described the accident,  stating that Cervantes struck plaintiff first, and then was pushed into his car a second time by Metoyer's car striking Cervantes.  Id. at 2.  The letter then described plaintiff's

11

"Bodily Injuries," noting the diagnosis and treatments (where applicable) of the issues with his left shoulder, spine, and tinnitus.  Id.

The cover letter further stated that the "negligence" of Cervantes and Metoyer "caused [plaintiff] severe physical and emotional injury." Id. at 3.  Specifically, the letter stated that "plaintiff was not at fault" and that Cervantes was "100% responsible for her failure to stop, causing the initial impact; and . . .  Metoyer was 100% responsible for the second impact and its resulting damages." Id.  Further the letter stated "[t]he collisions and resulting healthcare caused [plaintiff] to miss enough work that, while Jason was occupied with recovery, his business suffered to a point of full loss." Id.

The cover letter then listed the various damage categories, and corresponding amounts, as follows:

- •  $51,831.42 for medical treatment, itemized by service provider;

- •  $350,000 for "First Impression Pain, Suffering, Agony[,] Personal Distress and Physical Injury";

- •  $185,000 for "Lost wages"[6] ; and

- •  $2,398,411 for "Impairment of earning ability."

Id. at 3-4.  The November 29 demand included roughly 380 pages of medical records, but no information regarding plaintiff's employment or business.

On December 8, 2016, Graham referred plaintiff's demand to Peter Wheeler, an outside attorney.  Dkt. ## 128, at 21; 142, at 22.  Wheeler was subsequently retained by defendant to "assist

---

[6]   The line item actually reads "Lost wages and loss of." The Court treats the additional language as a scrivener's error, as plaintiff had been under contract to earn $185,000 per year as an employee in 2013. Dkt. # 90-26, at 33.

in the handling of this [UIM] claim in anticipation of litigation." Dkt. # 107-20.  The letter confirming Wheeler's retention stated  Wheeler was "retained to represent our insured regarding the referenced matter."  Id. at 1.  However, the letter stated the "name of [the] party to appear for" was defendant.  Id.  The letter further identified the plaintiff in the matter as "Jason Klintworth" and the "plaintiff's attorney" as "Adam Weintraub."  It identified the "defense attorney" as "Peter Wheeler." Id. at 3.

Wheeler and Weintraub spoke on the phone in mid-December to discuss the claim.  Dkt. # 90-15.  On December 28, 2016, Weintraub wrote to Wheeler.  Dkt. # 90-16, at 6.  In that letter, Weintraub advised Wheeler of the status of claims against Allstate, Cervantes's insurance company, and Key Insurance, Metoyer's insurance company.  He explained that Allstate was willing to settle with plaintiff for the maximum liability insurance limits, subject to a waiver of right of UIM subrogation by defendant.  Id.  He also indicated Metoyer's insurance company would likely institute an interpleader action with respect to collision because the $25,000 policy limit could not satisfy the competing claimants' demands.  Id.  Weintraub then asked if Wheeler had a list of the information Wheeler mentioned he would need from plaintiff during the mid-December call.  Id.

On January 4, 2017, Wheeler replied to Weintraub.  Dkt. # 90-15.  The letter confirmed Wheeler was "retained to assist [defendant], one of the CNA group of insurance companies, in the investigation and evaluation of the claim," and asked that all communications regarding the claim be directed to him.  Id. at 1.  Wheeler requested a copy of the settlement letter Allstate sent plaintiff, as Weintraub had not enclosed it in his December 28 letter.  Wheeler stated that he would advise regarding the Allstate subrogation waiver once he had a chance to review it with defendant.  Id.  He requested that Weintraub send the declarations page of the Allstate policy.  Id.  Wheeler also asked

for the declarations page of Metoyer's Key Insurance policy or contact information for the appropriate person at Key Insurance.  Id. at 2.

Wheeler then asked if it would be possible to examine plaintiff under oath, and requested several additional documents.  Id. at 2-3.  The requested documents included any further medical records and bills, if they were not already included in the demand; photographs of the collision; plaintiff's vehicle repair information; explanations of benefits (EOBs) related to some of the medical bills included in the November 29 demand; documentation of the claim of lost wages and impairment of earning capacity, specifically, monthly profit and loss statements and federal and state tax records for the past five years; and any relevant previous employment information.  He also attached two releases for plaintiff to sign in the event defendant needed authorization to request plaintiff's medical information or employment information.  Id. at 3.  Wheeler also sent Weintraub the final police report, as Weintraub had sent only the preliminary one with the demand.

That same day, Wheeler sent an internal email to Graham.  In the email, Wheeler confirmed that he had been retained "to assist the company in the investigation and evaluation of the claim for UIM benefits referenced above," and that he would be defendant's point of contact with plaintiff's counsel, Weintraub, moving forward.  Dkt. # 90-16, at 2.  The letter also provided updates of his communications with Weintraub.  Wheeler stated Weintraub knew that both Cervantes and Metoyer had insurance, but that they were likely underinsured.  Id. at 2-3. Wheeler then explained that Weintraub's demand included the preliminary police report only, and that Wheeler sent the official report to Weintraub.  Id. at 4.  Wheeler explained that the most significant difference was that the official report noted that Metoyer was operating his vehicle under the influence of drugs.  Id.

14

Wheeler noted that, on November 7, 2016, an arrest warrant had been issued for Metoyer and he had been charged with two counts of first degree manslaughter.  Id.

Wheeler also attached a creditor's claim filed by plaintiff in Cervantes's estate proceeding on November 3, 2016.  Id.  Wheeler noted that in this claim, plaintiff valued his claim at $300,000 (including a claim of $250,399.06 for "[F]irst Impression Pain, Suffering, Agony, Personal Distress and Physical Injury, Lost wages and loss of impairment of (sic) earning ability."  Id.  Wheeler noted that this was a large departure from the $2.5 million requested in the November 29 demand letter to defendant and stated he would ask plaintiff about it in the examination, once scheduled.  Id.  He also attached a summary of the claimed medical issues and bills for Graham's review, stating that he would provide more significant analysis of those medical bills after his examination of plaintiff.  Id.

On January 5, 2017, Wheeler sent Weintraub a certified copy of the policy.  Dkt. # 90-17. On January 6, 2017, Weintraub wrote to Wheeler, sharing the relevant Allstate and Key Insurance contact information, and stating that he requested that plaintiff provide the relevant tax and profit and loss statements to support the claim made in the demand.  Dkt. # 90-18, at 1-2.  He asked whether the medical information release could be tailored to release only the information relevant to the claim.  He also included the Allstate offer to settle, and the Key Insurance communication indicating that an interpleader action would likely be filed as to Metoyer's policy.  Id. at 3-4.  On January 17, 2017, Wheeler responded to Weintraub asking whether Weintraub could forward the release that Allstate asked to be signed, which had not been attached the correspondence.  Dkt. # 90-19, at 1.  He also stated that a limited medical information release was acceptable and attached an editable document so that it could be tailored by Weintraub.  Id. at 2. He stated that "it may turn out that I don't need to collect any additional records or bills, since it is your belief that all of them were

included in the settlement brochure.  But it may prove helpful to have an executed authorization on hand if it is needed."  Id.  He closed by stating he awaited the requested information from plaintiff regarding the business-related damages.  Id.

On January 26, 2017, Weintraub replied to Wheeler including the proposed release from Allstate, updating Wheeler as to the Key Insurance interpleader, and stating he would follow up with plaintiff about the outstanding documents.  Dkt. # 90-20.  On January 31, 2017, Wheeler emailed Weintraub an umbrella policy issued to ALK to see if Weintraub thought it was applicable.  Dkt. # 90-21.  On February 6, 2017, Weintraub replied to Wheeler, stating he did not think that the policy was applicable to plaintiff's claims.  He also attached the requested HIPPA release and the outstanding documents relating to plaintiff's employment-related claims, totaling over 300 pages. Dkt. # 90-22.

On March 10, 2017, Weintraub wrote to Wheeler requesting an update on the claim.  Dkt. # 90-23.  He stated he was unable to obtain EOBs and enclosed a letter, dated January 26, requesting those EOBs, and a second request dated that day.  Id. at 1, 3, 4.  He asked for an explanation as to why the EOBs would be necessary to arrive at an initial evaluation of the claim.  Id. at 1.

On March 20, 2017, Wheeler replied that the EOBs were "helpful in determining the amount of medical expenses paid under [Okla. Stat. tit. 12, § 3009.1], i.e., the amount of medical expenses that [plaintiff] is 'legally entitled to recover'. . . ." Dkt. # 90-24 at 1.  Wheeler also stated that he reviewed the materials in the November 29 demand and the materials provided in early February, and stated that defendant was going to make an advance payment.  Id. at 1-2.  However, he noted that more detail was needed to finalize his evaluation.  He requested to take plaintiff's statement under oath the following week  Id. at 2.

16

On March 29, 2017, Wheeler examined plaintiff under oath. Dkt. # 90-26, at 5-51. In the examination, Wheeler questioned plaintiff about the medical information he received in the November 29 demand and the supplemental financial materials. He specifically questioned plaintiff about his current physical and mental health status and whether certain symptoms were ongoing or had resolved. Plaintiff indicated physical symptoms relating to his tinnitus, headaches, shoulders, and neck, were still ongoing. Id. at 13-17. He also stated that he was still receiving treatment from Dr. Harris. Id. at 25-27. However, he indicated that he did not pursue additional follow-up appointments regarding his tinnitus and right shoulder because he did not have adequate funds to do so. Id. at 13, 17. When asked, plaintiff stated that he believed his most painful physical injury was his shoulder. Id. at 29. Wheeler asked plaintiff about the doctor's report that indicated plaintiff had fallen and, as a result, his left shoulder healing had been set back. Dkt. # 90-13, at 20-22. Plaintiff stated he did not recall the fall. Dkt. # 90-26, at 21.

Plaintiff also stated that he had been treated weekly by a minister for depression, and had subsequently been released from the minister's care. Id. at 26-27. Plaintiff stated that the depression was an ongoing issue. Id. at 49. Plaintiff also stated he was able to return to work, both mentally and physically, by 30 days prior to that March 29 examination [i.e., late February 2017]. Id. at 49.

On April 13, 2017, Wheeler submitted a preliminary evaluation and update to Graham. Dkt. # 90-26. In that report, Wheeler recommended making an initial payment to plaintiff of $50,000. Id. at 2. He stated that a reasonable amount for the claim was at least $75,000, but that Cervantes's insurance company had paid the limits of its policy, $25,000, to plaintiff, subject to the subrogation release that defendant had executed. Id. at 1.

17

On April 21, 2017, Wheeler wrote to Weintraub regarding earlier communications about the settlement with Cervantes's estate and the dismissal of the proceeding against it.  Dkt. # 90-27.  Wheeler stated that he trusted that the $25,000 settlement check from Allstate had been received by that point.  Id. at 1.  He also enclosed a check for $50,000 from defendant and stated "this payment is not intended to represent the full value of [plaintiff's] UIM claim," and that plaintiff "may cash this check without prejudice to any further rights he may have under the policy or under the law."  Id.

On May 31, 2017, Wheeler wrote to Graham submitting his "comprehensive report" on plaintiff's claim.  Dkt. # 90-28, at 1.  In that report, Wheeler summarized plaintiff's claims of tinnitus (id. at 4), headaches (id. at 4-5), neck and back pain (id. at 5-6), right shoulder (id. at 6, 8), left shoulder (id. at 6-8), hospitalization (id. at 8-9), right hand and right elbow (id. at 9-10), depression (id. at 10), and his current condition (id. at 10-11).  The report reviewed the treatments received, the medical notes, and plaintiff's testimony regarding each of the injuries in the November 29 demand.  The report then summarized plaintiff's financial losses.  Wheeler discussed plaintiff's purchase of ALK and its financial condition from 2013 until plaintiff shut it down in May 2016.  The report goes on to state that plaintiff "testified that he is now physically able to work." Id. at 16.  He further stated that plaintiff would not have returned to work as early as September 2016, as he was still seeing his chiropractor twice a week.  Id.  However, Wheeler represented to Graham that plaintiff stated he was "both physically and mentally" able to return to work by February 2017.  Id.; Dkt. # 90-26, at 49.  Wheeler stated that plaintiff represented "depression prevented him from seeking employment before then," but that he was actively seeking employment as of the date of his testimony [March 2017].  Dkt. # 90-28, at 16.

Next, Wheeler addressed the assessment of the claimed damages in light of the policy and

applicable Oklahoma law and jury verdicts.  He stated that

> [t]he remaining task is to determine if additional investigation is needed and to fairly
> evaluate his bodily injury claim to decide if an additional supplemental payment is
> owed by [defendant] as damages sustained in the accident, much as a jury would. Of
> course, the damages are the amount of money that would reasonably and fairly
> compensate [plaintiff] for the injuries he sustained as a direct result of the negligent
> conduct of Ms. Cervantes and/or Mr. Metoyer.

Id. at 17.  Drawing from the Oklahoma Uniform Jury Instructions (OUJI), Wheeler outlined the

factors that might be considered in arriving at compensation for plaintiff's injury.  Wheeler then

described other applicable law, stating that "in Oklahoma, the amount of money that a jury can award

for non-economic damages, such as mental and physical pain and suffering, disfigurement, etc., is

limited by statute to an amount that shall not exceed $350,000, as per [Okla. Stat. tit. 23, § 61]."  He

also stated that Okla. Stat. tit. 12, § 3009.1 "provides that the amount of medical bills paid for any

treatment are the amounts admissible at a trial, not the amounts billed in the treatment of a party."

Id. at 18.

Wheeler's report indicated that he had reviewed the medical records, testimony, and

Oklahoma law and that he had reached the following conclusions regarding plaintiff's injury-related

claims:

- •   plaintiff had "a significant and painful injury to his left shoulder caused by the
    accident that required surgical repair" but that "evidence indicates he had a
    reasonably good result from that surgery."  Id. at 19.

- •   plaintiff "sustained soft-tissue type injuries to his neck and low back," which, as a
    personal injury lawyer, Wheeler evaluated by stating: "I have heard medical

testimony from qualified experts repeatedly given that 4-8 weeks of physical therapy or chiropractor care is reasonable.  In my experience trying car accident cases, jurors have readily understood that sometimes treatment beyond a reasonable period may be preferred by a patient, but perhaps may not be medically necessary."  Id.

- plaintiff did have right shoulder, elbow, and hand issues, but questioned "from a lawyer's perspective, the causal connection between the accident and problems with the insured's right shoulder, right elbow and right hand that arose after the left shoulder surgery of June 2016.  I am not aware of any medical evidence that suggests that those complaints are related to the subject accident."  Id. at 20.

- plaintiff's "medical care and expense related to the diabetes problem"–i.e., the four-day hospitalization–"was most likely not caused by the accident;" however, Wheeler recommended paying those expenses as plaintiff "stopped taking his diabetes medicine before surgery at the direction of the surgeon's office, and apparently misunderstood that he was to resume taking it right after surgery, i.e., he would not have had this miscommunication were it not for the need for surgery caused by the accident."  Id. at 20.

- plaintiff "had headaches for a few weeks following the accident. The headaches occurred occasionally after that, but appear to be related to the difficulty with his neck. It does not appear that there was specific treatment or medicine for headaches alone, but more as treatment for neck soreness that can lead to a headache."  Id. plaintiff had tinnitus after the accident that "disturbs his sleep sometimes. But he was

examined once for this condition, no specific treatment was prescribed and there apparently was not hearing loss." Id.

- plaintiff stated he thought he was depressed after the accident but "[t]here is no formal diagnosis of this condition, and the only professional treatment he received was from a minister for a relatively brief period of time." Further, Wheeler found "the evidence suggests that this difficulty was more likely caused by the loss of his business and the financial difficulties that followed." Id.

- Wheeler concluded approximately $40,000 in medical bills were incurred, including medical bills related to plaintiff's post-operative ketoacidosis and sepsis. Dkt. ## 107, at 19; 128, at 13.

Wheeler then discussed plaintiff's damages claim for "First Impression Pain, Suffering, Agony, Personal Distress and Physical Injury":

- Wheeler first noted plaintiff's request for $350,000 was apparently "meant to seek the maximum amount authorized by the Oklahoma statute referenced above for non-economic losses." Id. at 21.

- Wheeler then stated that both his experience as an attorney and jury verdict research indicate that "a jury hearing the evidence developed to date would not award the maximum amount." Id. Wheeler attached numerous jury verdict reports that predominantly involved crash-related shoulder injuries accompanied by other injuries (including injuries to the spine, ear, neck, and back) that required surgery. Id. at 74-91.

21

- Wheeler also noted that three years earlier he "settled an operated shoulder-case pending in federal court in Oklahoma for $145,000" that did not assert claims for lost income or loss of earning capacity.  Id. at 19.

- Wheeler also examined a "creditors claim" filed by plaintiff in a proceeding against Cervantes's estate the same month the demand was submitted, which "represented to a court . . . that 'First Impression Pain, Suffering, Agony, Personal Distress and Physical Injury' _plus_ 'Lost Wages and loss of impairment of earning ability' was valued at $250,399.06." Id. at 21 (emphasis in original).

- After noting the above, Wheeler stated that it was his "professional opinion that a fair and reasonable value for the bodily injury claim is between $100,000-$150,000, excluding the financial component." Id.

Wheeler then assessed the claim for $185,000 in lost wages and the claim for  $2,398,411 in loss of earning capacity.  He noted that, upon review and consideration of plaintiff's financial personal taxes and business records:

- plaintiff "made $185,000 in 2014" but "reduced his own pay down to $125,000 for 2015." As ALK was operating at a loss, Wheeler concluded that plaintiff would have earned a maximum of $125,000.  Id. at 21-22.

- plaintiff's business was operating at a loss, with no evidence of a turnaround, such that Wheeler was "having difficulty coming to the conclusion that [plaintiff] suffered any financial loss that was caused by the subject accident." However, Wheeler could not "say that ALK Enterprises was absolutely doomed to fail by a certain date." Id. at 24.

22

- Wheeler noted that in plaintiff's testimony plaintiff stated he was physically and mentally able to work in about February 2017, roughly eleven months from the date of the crash.  Id. at 16.

- Wheeler thus recommended that plaintiff be paid $125,000 for a full year of lost wages, and that no money was due to plaintiff for the loss of his business.

Wheeler's final evaluation valued plaintiff's damages between $225,000 and $275,000, comprised of approximately $40,000 in medical bills, $110,000 for "First Impression Pain, Suffering, Agony, Personal Distress and Physical Injury," and $125,000 in lost wages.  Dkt. ## 107, at 19; 128, at 13.

On June 9, 2017, Wheeler wrote to Weintraub regarding the claim. Dkt. # 90-30.  Wheeler stated that defendant "has evaluated the information from its investigation and determined that a supplemental payment for additional UIM benefits is appropriate" and enclosed a check for $200,000.  Id. at 1.  Wheeler explained "All of the payments referenced herein total the sum of $275,000 ($25,000 liability insurance payment from [Cervantes's insurance company] and $250,000 in UIM benefits from [defendant] made in two payments), a figure representing the UIM carrier's determination of the full value of [plaintiff's] bodily injury claim."  The letter confirmed that defendant was not requesting a release and stated plaintiff could deposit the check "without prejudice to any further rights he may have under the policy or under the law."  Id.

## C. Procedural History

On June 24, 2016, prior to his hospitalization for diabetic ketoacidosis and sepsis, and prior to sending the November 29 demand, plaintiff brought suit in state court against Metoyer, the driver in the rear-most car, for negligence.  Dkt. # 2, at 1.  On July 26, 2016, plaintiff filed an amended

23

petition, which added Cervantes, the driver in the middle car, to the suit.  Id.  On April 11, 2017, the estate of Cervantes was dismissed with prejudice.  Dkt. # 72, at 2.  On June 20, 2017, eleven days after defendant sent plaintiff the second check in the amount of $200,000, plaintiff filed a second amended petition (SAP) in the state court action, alleging two claims against defendant:  breach of contract (count three) and bad faith (count two).  Dkt. # 26, at 79.  On March 5, 2018, plaintiff voluntarily dismissed Metoyer.  Dkt. # 2 at 3.  On June 6, 2019, plaintiff dismissed the breach of contract claim against defendant (Dkt. # 4-23).

The case was removed to this Court after plaintiff filed a third amended petition (TAP), adding two diverse defendants.  Dkt. # 2.  On June 29, 2020, this Court issued an order (Dkt. # 72) denying plaintiff's motion to remand.  Both defendants added in the TAP have been dismissed from the case, and the only remaining claim is plaintiff's claim for bad faith against defendant.  The Court turns to that claim now.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993).  The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317.  "Movants for summary judgment bear the initial burden of demonstrating the absence of a genuine issue of material fact and entitlement to judgment as a matter of law."

24

Silverstein v. Federal Bureau of Prisons, 559 F. App'x. 739, 752 (10th Cir. 2014); see also Adler v. Wal–Mart Stores, Inc., 144 F.3d 664, 670–71 (10th Cir. 1998).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff."  Anderson, 477 U.S. at 252.  In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 250.  In its review, the Court construes the record in the light most favorable to the party opposing summary judgment.  Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

### III.

"Under Oklahoma law, an insurer has an implied duty to act in good faith and deal fairly with its insured."  Porter v. Farmer Ins. Co., Inc., 505 F. App'x 787, 791 (10th Cir. 2012) (unpublished) (citing Badillo v. Mid Century Ins. Co., 121 P.3d 1080, 1093 (Okla. 2005)).[7]  "Violation of this duty gives rise to an action in tort."  Id. (citing Bannister v. State Farm Mut. Auto. Ins. Co., 692 F.3d 1117, 1123 n.8 (10th Cir. 2012)).  "The mere allegation that an insurer breached the duty of good faith and fair dealing does not automatically entitle a litigant to submit the issue to a jury for determination."  Oulds v. Principal Mut. Life Ins. Co., 6 F.3d 1431, 1436 (10th Cir. 1993) (citing City Nat'l Bank & Trust Co. v. Jackson Nat'l Life Ins., 804 P.2d 463, 468 (Okla. Civ. App. 1990)).

---

[7]     This and other unpublished decisions are not precedential, but they are cited herein for their persuasive value. See Fed. R. App. 32.1; 10th Cir. R. 32.1.

In determining whether summary judgment is appropriate the Court must consider "under the facts of the particular case and as a matter of law, whether [defendant's] conduct may be reasonably perceived as tortious." Id. If the Court finds that insurer acted reasonably as a matter of law, summary judgment is warranted. See Skinner v. John Deere Ins. Co., 998 P.2d 1219, 1223 (Okla. 2000). "A jury question arises only where the relevant facts are in dispute or where the undisputed facts permit differing inferences as to the reasonableness and good faith of the insurer's conduct." Oulds, 6 F.3d at 1436. In this case, plaintiff asserts bad faith based on defendant's alleged delay, denial of benefits, and inadequate investigation.

## A. Bad Faith Delay or Denial

Defendant seeks summary judgment on plaintiff's bad faith claim, arguing plaintiff fails to meet several required elements. To prevail on a bad faith claim based on defendant's improper delay or denial, plaintiff must show (1) he is entitled to benefits under the policy, (2) defendant had no reasonable basis for denying his claim, (3) defendant did not deal fairly and in good faith with plaintiff, and (4) defendant's violation of its duty of good faith and fair dealing was the direct cause of plaintiff's injury. Ball v. Wilshire Ins. Co., 221 P.3d 717, 724 (Okla. 2009). Therefore, to prevail on summary judgment, defendant must show that at least one element of the claim fails as a matter of law. To that end, defendant argues that any bad faith claim is barred because i) defendant has shown a legitimate dispute between the parties, ii) plaintiff has failed to demonstrate inadequate investigation, and iii) plaintiff cannot demonstrate he is legally entitled to the lost profits of ALK. Dkt. # 90, at 25-37. Defendant also seeks summary judgment on plaintiff's claim for punitive damages, stating there is no evidence to establish conduct warranting punitive damages. Id. at 37-39.

26

In his motion for partial summary judgment, plaintiff argues that defendant's conduct demonstrates bad faith as a matter of law. Specifically, plaintiff contends that defendant: unreasonably delayed nine months before starting an investigation into plaintiff's UIM claim (Dkt. # 107, at 30-31); failed to disclose UIM coverage, in violation of Okla. Stat. tit. 36, § 1250.5 (1), "Acts by an insurer constituting an unfair claim settlement practice" (id. at 27-28); wrongfully limited plaintiff's damage cap to $350,000, pursuant to Okla. Stat. tit. 23, § 61 (id. at 36); failed to consider plaintiff's claim for negligent infliction of emotional distress (id. at 36-37); used lawyers in a manner that violates the rules of professional conduct (id. at 37-39); and disregarded its continuing duty to investigate plaintiff's claims during the pendency of this litigation (id. at 35-36).

"The elements of a bad faith claim against an insurer for delay in payment of first-party coverage are: (1) claimant was entitled to coverage under the insurance policy at issue; (2) the insurer had no reasonable basis for delaying payment; (3) the insurer did not deal fairly and in good faith with the claimant; and (4) the insurer's violation of its duty of good faith and fair dealing was the direct cause of the claimant's injury." Ball, 221 P.3d at 724. "The absence of any one of these elements defeats a bad faith claim." Id.

A bad faith claim is not supported "where there is a 'legitimate dispute' as to coverage or amount of the claim, and the insurer's position is 'reasonable and legitimate.'" Thompson v. Shelter Mut. Ins., 875 F.2d 1460, 1462 (10th Cir. 1989) (quoting Manis v. Hartford Fire Ins. Co., 681 P.2d 760, 762 (Okla. 1984)). "[A] claim must be paid promptly unless the insurer has a reasonable belief that the claim is legally or factually insufficient. The decisive question is whether the insurer had a 'good faith belief, at the time its performance was requested, that it had justifiable reason for

withholding payment under the policy.'" Buzzard v. Farmers Ins. Co., 824 P.2d 1105, 1109 (Okla. 1991) (citing Buzzard v. McDanel, 736 P.2d 157, 159 (Okla. 1987)).

"Where an insurer has demonstrated a reasonable basis for its actions, bad faith cannot exist as a matter of law." Beers v. Hillory, 241 P.3d 285, 293 (Okla. Civ. App. 2010); see also Barnes v. Okla. Farm Bureau Mut. Ins. Co., 11 P.3d 162, 170-71 (Okla. 2000)) ("[B]ad faith cannot exist if an insurer's conduct was reasonable under the circumstances."). Evidence of an insurer's "internal negligence is not probative of the issue of bad faith. Bad faith and negligence are not synonymous." Peters v. American Income Life Insurance Co., 77 P.3d 1090, 1098 (Okla. Civ. App. 2002). "[T]he essence of the intentional tort of bad faith with regard to the insurance industry is the insurer's unreasonable, bad-faith conduct, including the unjustified withholding of payment due under a policy, and if there is conflicting evidence from which different inferences may be drawn regarding the reasonableness of insurer's conduct, then what is reasonable is always a question to be determined by the trier of fact." McCorkle v. Great Atl. Ins. Co., 637 P.2d 583, 587 (Okla. 1981); see also Badillo, 121 P.3d at 1093.

*i. Unjustified Delay*

At the outset, the Court notes that the bad faith denial or delay of payment on a claim rests on the premise that a claim has been made. Under Oklahoma law, the burden of establishing a UIM claim is on the insured. The insured must "prove the existence of two simultaneous conditions precedent: 1) that he has a legal right to recover against the tortfeasor, and 2) that his claim exceeds the available liability coverage of the tort-feasor." Porter v. State Farm Mut. Auto. Ins. Co., 231 P.3d 691, 693 (Okla. Civ. App. 2010); see also Gates v. Eller, 22 P.3d 1215, 1219 (Okla. 2001) ("[A]n

injured insured must demonstrate that the preconditions for loss under the uninsured motorist coverage exist before he or she can recover under the primary uninsured motorist coverage.").

In addition to showing a claim exists under Porter v. State Farm Mutual Automobile Insurance Co., 231 P.3d 691, 693 (Okla. Civ. App. 2010), the policy requires that

> [a] person seeking Uninsured Motorist coverage must also notify us, in writing, of a tentative settlement between the 'insured' and the insurer of an 'uninsured motor vehicle' and allow us 60 days to advance payment in an amount equal to the tentative settlement to preserve our rights against the insurer, owner or operator of such 'uninsured motor vehicle.' This notice must be sent by certified mail and must include:
>> (1) Written documentation of economic losses;
>>
>> (2) Copies of all medical bills; and
>>
>> (3) Written authorization or a court order allowing us to obtain reports from any employers and medical providers.

Dkt. # 128-1, at 34. Per the policy, UIM claims are payable only if "a. [t]he limit of any applicable liability bonds or policies has been exhausted by payment of judgments or settlements; or b. a tentative settlement has been made between an 'insured' and the insurer of [an underinsured vehicle] . . . and we (1) have been given prompt written notice of such tentative settlement; and (2) [a]dvance payment to the 'insured' in an amount equal to the tentative settlement within 30 days after receipt of the notification." Id. In this case, plaintiff did not submit any medical records, whatsoever, prior to the submission of the November 29 demand. As a result, the Court finds that plaintiff's first UIM claim was made on November 29, 2016.

That November 29 demand included approximately 380 pages of medical records through the date the demand was made, but did not include any documentation supporting the claims for financial loss. Dkt. # 90-13. The financial records were provided on February 6, 2017. Dkt. # 90-

22.   On March 29, 2017, Wheeler examined plaintiff under oath.  Dkt. # 90-26, at 5-51.  Thereafter, Wheeler made a final recommendation to defendant to settle the UIM claim on May 31, 2017.  Dkt. # 90-28.  Defendant agreed with Wheeler's recommendation and issued plaintiff a second check for $200,000 on June 9, 2017.  Dkt. # 90-30.

The Court finds that the period of approximately six months from submission of the November 29 demand–which included documents that demonstrated only that plaintiff had incurred approximately $40,000 of medical debt–to the issuance of the final evaluation and total payment of $275,000 by June 6, 2017, was not unreasonable as a matter of law.  This is especially true where the financial information (including information that supported plaintiff's claim for lost wages) was not provided until February 6, 2017.   Further, the Court finds there is no evidence that defendant delayed payment in bad faith.

Plaintiff relies on the Oklahoma Supreme Court's decision in Buzzard v. Farmers Insurance Co., 824 P.2d 1105 (Okla. 1991), to argue that waiting until the contract provisions are met is unreasonable.  Dkt. # 107, at 28.  Plaintiff explains that, in Buzzard, the court held that "[i]f the claim exceeds the amount available under the liability policy, the underinsurer must take prompt action to determine what payment is due and may not delay the payment of benefits until exhaustion of liability limits."  824 P.2d at 1112.  The Buzzard court explained that

> [t]he underinsurer may not safely await settlement between the liability insurer and the insured.  Instead, the insurer must go about the business of investigating and evaluating the claim.  An insurer is readily equipped to make such a determination, and to assign a dollar value to the claim.  Once this is accomplished, if the insurer determines that the claim does not exceed liability limits, and such valuation is supported by reasonable evidence, the underinsurer may delay payment. However, if the underinsurer does not conduct an investigation, or after investigation, determines that the likely worth of the claim exceeds the liability limits, prompt payment must be offered.

Id.  While it is certainly true that an insurer must conduct an investigation to determine whether the insured's damages will exceed at-fault parties' liability limits, the insurer's obligation to conduct a preliminary investigation is governed by a reasonableness standard.  Porter, 505 F. App'x at 794 ("Oklahoma does not require an insurer's investigation to be perfect; it need only be 'reasonably appropriate under the circumstances.'") (quoting Buzzard, 824 P.2d at 1109).  The record reflects that the preliminary information provided to defendant did not indicate any major claims were forthcoming.  On March 11, 2016, plaintiff told defendant he had seen a doctor and would be returning to the doctor.  However, defendant also knew that, on the day of the accident, plaintiff walked away from the scene without receiving or seeking medical attention and did not seek emergency help of any kind.

In the following months, plaintiff then proceeded with conservative treatment to address what he felt to be the most significant injury, his shoulder.  Dkt. # 90-26, at 29.  It was not until about the time of plaintiff's June 23, 2016 surgery, more than three months after the accident, that the severity of plaintiff's medical situation began to materialize.  The bill from the Oklahoma surgical hospital, which was the largest medical expense submitted to defendant, totaled $17,482.[8]  Given the cost of

---

[8]    It is unlikely plaintiff could have made a viable UIM claim before his June shoulder surgery. Prior to that surgery and subsequent hospitalization, the medical evidence does not appear to support plaintiff suffered damages in an amount greater than $25,000 (i.e., the Allstate policy limit). While the record now shows that plaintiff endured substantial difficulties after the crash, those details, including the likely duration of many of plaintiff's conditions (shoulder pain, headaches, tinnitus, depression, etc) were not likely medically determinable until some time after the accident. Additionally, plaintiff points to no evidence that supports that a claim for a year of lost wages or a claim for permanent impairment of earning ability would have been provable at this stage. This is likely because the permanency of many of plaintiff's conditions can only be inferred after a certain period of time.

31

the surgery, as of late June 2016, it was likely apparent that plaintiff's damages would exceed the limits of at least one of the at-fault parties' insurance policies.

However, the record demonstrates that a few days prior to plaintiff's June 23, 2016 surgery, defendant inquired as to whether plaintiff would be making a UIM claim and was told plaintiff was not yet making such a claim. Daniel's June 19, 2016 email to defendant informed defendant that Weintraub told Daniel plaintiff was not pursuing a claim at that time. Dkt. # 90-11. Plaintiff does not dispute that defendant received this email, and does not point to any evidence that contradicts that defendant was operating under the impression that no claim had been made. Plaintiff merely argues that reliance on Daniel's "hearsay" representation of plaintiff's position is unreasonable. Dkt. # 104, at 10. This Court disagrees. Defendant had no reason to believe Daniel was misrepresenting his conversation with Weintraub. Defendant's reliance on such a statement is not unreasonable.

Absent any evidence that defendant had reason to suspect such a statement was a misrepresentation or that defendant should not have trusted such a statement, the Court finds defendant's reliance on Daniel's statement was objectively reasonable. The record further reflects that, on July 13, 2016, defendant communicated that belief to plaintiff. Dkt. # 90-9. In Graham's July 13, 2016 response to Weintraub's June 15, 2016 letter, inquiring what UM/Medpay coverage was available to plaintiff, he stated that defendant was operating under the belief that the other liability policies were adequate to provide recovery for plaintiff and also noted that the medpay limits had not yet been exhausted. Id. The record does not indicate that Weintraub ever replied to clarify a misconception.

Then, unexpectedly, plaintiff's medical claim substantially increased on July 14, 2016, when he was hospitalized for diabatic ketoacidosis and sepsis, resulting from failure to take his diabetes

medications after surgery.  That hospitalization bill totaled $15,676.08.  It is evident that, by mid-July 2016, plaintiff would have been able to demonstrate that his damages exceeded the liability limits of Cervantes's Allstate policy limit of $25,000, and possibly exceeded Metoyer's Key Insurance policy, which also had a $25,000 limit.  However, plaintiff, either individually or through Weintraub, does not appear to have contacted defendant to alert it of the unexpected increase in value of the claim.  This series of events is highly unusual and, as a result, the Court finds that no reasonable jury could find defendant acted in bad faith solely for failing to anticipate these massive medical claims (which spurred the conditions for plaintiff's claim to exceed the liability limits of the at-fault parties) approximately four months after the initial crash.  Further, the Court finds that, as it is clear that the plaintiff and his attorney were in communication with defendant, it is not unreasonable for defendant to have expected some notice or indication that an unexpected, but related, loss had occurred.  As a result, the Court finds that any delay in defendant's realization that plaintiff had a viable UIM claim was not unreasonable, or in bad faith.

### ii. Legitimate Dispute

To prevail on any bad faith claim, plaintiff must show that defendant had no reasonable basis for denying his claim, i.e., that there was no legitimate dispute.  Ball, 221 P.3d at 724.  The record demonstrates that defendant did not deny any claims plaintiff made for payment of medical bills submitted with the November 29 demand.  Dkt. ## 90-28, at 20; 90-29.  Plaintiff does not point to any evidence in the record that refutes this.  As a result, to the extent plaintiff alleges bad-faith denial of payment of plaintiff's medical bills submitted with the November 29 demand, plaintiff's claim is without merit.

To the extent that plaintiff asserts that plaintiff's claim for $185,000 in lost wages was denied in bad faith, plaintiff's claim is also without merit. Defendant reasonably examined plaintiff's financial records and found that plaintiff's salary was not $185,000 immediately prior to the accident. While plaintiff speculates he could have made more than $125,000 in 2016, that speculation does not entitle him to a determination that defendant acted in bad faith by awarding him a full year's salary at his most recent salary level. This is especially true where plaintiff presented no evidence that ALK would have recovered from its dire financial straights but for the accident.[9] Because defendant has demonstrated a legitimate dispute exists as to plaintiff's claim of $185,000 in lost wages, the adjustment of that claim, and payment of a more recent annual salary of $125,000 was not bad faith as a matter of law.

### iii. Failure to Disclose UIM Coverage

Plaintiff strenuously argues bad faith is evident because defendant allegedly did not disclose that plaintiff had UIM coverage, in violation § 1250.5(1) of Oklahoma's Unfair Claims Settlement Practices Act (UCSPA), "Acts by an insurer constituting an unfair claim settlement practice." Dkt. # 107, at 27-28. Section 1250.5(1) provides that "[f]ailing to fully disclose to first party claimants, benefits, coverages, or other provisions of any insurance policy or insurance contract when the benefits, coverages or other provisions are pertinent to a claim," if committed in violation of §1250.3, "constitutes an unfair claim settlement practice." Okla. Stat. tit. 36, § 1250.5(1). Section 1250.3 provides:

---

[9]     In fact, the record contains evidence contrary to this contention. Plaintiff himself stated that when he called to reschedule one meeting because of the accident, the potential customer never even returned plaintiff's call. Dkt. # 90-26, at 45.

> [i]t is an unfair claim settlement practice for any insurer to commit any act set out in Section 1250.5 . . ., if:
>> 1. It is committed flagrantly and in conscious disregard of this act or any rules promulgated hereunder; or
>> 2. It has been committed with such frequency as to indicate a general business practice to engage in that type of conduct.

Id. at §1250.3.

The UCSPA "does not establish standards of care or standards of conduct for measuring whether an insurer has violated its duty of good faith and faith and fair dealing." Aduddell Lincoln Plaza Hotel v. Certain Underwriters at Lloyd's of London, 348 P.3d 216, 223 (Okla. Civ. App. 2015). A violation of the UCSPA may provide guidance to the court during summary judgment, but it does not establish bad faith as a matter of law. Beers, 241 P.3d at 294. A "violation occurs only if the insurer's failure to conform to some requirement of the statute is found to be flagrant or to constitute a business practice . . . An insurer may carelessly fail to perform some duty required by the statute with such frequency to warrant administrative sanction, but that does not establish more than negligent conduct in any individual case." Id.

In this case, plaintiff has alleged that there was a failure to disclose UIM coverage only. Dkt. # 107, at 27-28. Assuming, arguendo, defendant did not disclose UIM coverage, plaintiff's claim still fails because plaintiff does not allege defendant's failure to disclose meets the standard set forth in § 1250.3. Further, even absent such an allegation, there is nothing in the record that establishes that such a failure to disclose would have been anything other than negligent. Because the alleged failure to disclose UIM coverage is not bolstered by any evidence of bad faith as required by §1250.3 (i.e., evidence that the failure to disclose was done "flagrantly and in conscious disregard" of the UCSPA, or so frequently that it constituted a business practice), the Court finds any alleged failure

to disclose does not support a claim that defendant violated the UCSPA.  In the absence of supporting evidence, defendant's alleged non-disclosure of UIM coverage cannot be considered a violation of the UCSPA and cannot serve as evidence in support a claim of bad faith.

Additionally, the assertion that UIM coverage was not disclosed is belied by plaintiff's own assertion that "the substance of the [oral] communications that I remember are that I contacted CNA to see if I had insurance that would cover my losses.  I was told that I had underinsured motorist coverage.  I asked how I went [sic] about presenting a claim so that my insurance company would help me out in my time of need."  Dkt. # 128-3, at 5.[10]

*iv. Damage Cap*

Plaintiff also claims that defendant, in bad faith, wrongfully limited plaintiff's damage cap to $350,000, pursuant to Okla. Stat. tit. 23, § 61.  Dkt. # 107, at 36.  In fact, it was actually plaintiff who represented that he suffered precisely $350,000 in "First Impression Pain, Suffering, Agony[,] Personal Distress and Physical Injury" damages in his November 29 demand.  Dkt. # 90-13, at 3-4. Defendant evaluated plaintiff's claim.  Given that plaintiff asserted he was entitled to $350,000 in "First Impression Pain, Suffering, Agony[,] Personal Distress and Physical Injury" damages, plaintiff's assertion that defendant wrongfully capped plaintiff's recovery is plainly wrong and

---

[10]   The Court also notes that the notice of UIM insurance appears on the declarations page of the policy, is not obfuscated in any way, and that plaintiff was represented by counsel in making a claim under the policy.  See Dkt. # 90-2, at 4.

without merit.[11]   Defendant merely noted that it appeared plaintiff was seeking the maximum allowable amount under Okla. Stat. tit. 23, § 61.  Dkt. # 90-28, at 21.  No reasonable jury could find that such an observation was in bad faith.  Plaintiff's claim is without merit.

### v. Negligent Infliction of Emotional Distress

Plaintiff also claims that defendant failed to consider his claim for negligent infliction of emotional distress.  Dkt. # 107, at 36-37.  This claim fails as a matter of law, as the plaintiff has not stated and cannot state a valid claim for negligent infliction of emotional distress.  In order to recover for negligent infliction of emotional distress "[t]he plaintiff must be a victim, not a bystander, directly involved in the incident, damaged from directly viewing the incident[,] and a close family relationship must exist between the plaintiff and the party whose injury gave rise to plaintiff's mental anguish."  Ridings v. Maze, 414 P.3d 835, 838 (Okla. 2018) (quoting Shull v. Reid, 258 P.3d 521 (Okla. 2011)).  Therefore, plaintiff must to prove "1) the plaintiff was directly physically involved in the incident; 2) the plaintiff was damaged from actually viewing the injury to another rather than from learning of the accident later; and 3) a familial or other close personal relationship existed between the plaintiff and the party whose injury gave rise to the plaintiff's mental anguish."  Kraszewski v. Baptist Med. Ctr. of Oklahoma, Inc., 916 P.2d 241, 248 (Okla. 1996).  Plaintiff does not and cannot allege any familial or other close personal relationship existed between him and any other person injured in the March 9 accident.  A claim of bad faith requires that plaintiff prove he is legally entitled to recover under the policy.  Ball, 221 P.3d at 724 ("The elements of a bad faith

---

[11]     To the extent plaintiff argues that defendant should have ignored plaintiff's claim and arrived at a different number, plaintiff fails to point to any evidence of bad faith to support that argument.  At best, evaluation of plaintiff's "First Impression Pain, Suffering, Agony[,] Personal Distress and Physical Injury" damages without considering the potential for greater damages due to Metoyer's criminal conviction appears to be negligence at best.

claim against an insurer for delay in payment of first-party coverage are: (1) claimant was entitled to coverage under the insurance policy at issue . . ."); see also Uptegraft v. Home Ins. Co., 662 P.2d 681, 685 (Okla. 1983) (holding that under Okla. Stat. tit. 36, § 3636 "the insured must be able to establish fault on the part of the uninsured motorist which gives rise to damages and prove the extent of those damages.")  Because plaintiff cannot show that he is legally entitled to recover under this theory, absent a familial relationship with anyone injured at the scene of the accident, this claim fails as a matter of law.  Accordingly, defendant did not act in bad faith as a matter of law by disregarding any such claim.

*vi. Rules of Professional Conduct*

Plaintiff claims that defendant used lawyers in a manner that violates the rules of professional conduct, thus exhibiting bad faith. Dkt. # 107, at 37-39.  Specifically, plaintiff states that defendant acted in bad faith by appointing an attorney, Daniel, to represent plaintiff in ancillary actions without telling plaintiff the scope of that representation was limited to actions of third parties against plaintiff.  Id. at 38.  Plaintiff also alleges that, because Graham directed Daniel to ask plaintiff whether he intended to file a UIM claim, Graham created a conflict of interest.  Id. at 38-39.  Finally, plaintiff argues defendant violated the professional rules of conduct because "Wheeler had the competing duties to diligently represent his client, defendant, and a fiduciary duty to [p]laintiff as agent for [d]efendant," which were in conflict.  Id. at 39.

Plaintiff, however, has not submitted evidence to support the argument that the actions of the attorneys defendant hired were in bad faith.  The record demonstrates that defendant engaged Daniel to protect both defendant and plaintiff from third party actions.  This is reflected clearly in Graham's emails to plaintiff where Graham states he is hiring "defense counsel just as a precautionary

measure."  Dkt. # 128-13, at 1 (emphasis added).  He also expressly states that the "<u>defense</u> attorney assigned" is from Secrest, Hill, Butler & Secrest.  <u>Id.</u> at 2 (emphasis added).

Additionally, the contention that plaintiff believed Daniel was representing him in his UIM claims is belied by plaintiff's actions.  Plaintiff hired Weintraub to explore his claims against the at-fault parties, and possibly defendant, as early as June 2016.  Moreover, the record does not demonstrate that plaintiff communicated with anyone at Secrest, Hill, Butler & Secrest regarding any UIM claim, or that he believed that he was entitled to do so.  The summary judgment record demonstrates that defendant was forthright about Daniel's retention as a defense attorney for potential litigation against plaintiff and, further, the evidence supports that plaintiff was aware of the scope of Daniel's representation.  As a result, the contention that Daniel created a conflict of interest with plaintiff by simply asking whether plaintiff would be pursuing any UIM claim is without merit.

Plaintiff further contends that Wheeler's retention by defendant created a conflict of interest.  However, that is not supported by the record.  Defendant clearly hired Wheeler to review plaintiff's claims and evaluate what plaintiff was legally entitled to under the policy and Oklahoma law.  Wheeler made it clear that he was representing defendant both when contacting Weintraub and when examining plaintiff under oath.  Dkt. ## 90-15; 90-26, at 6.  As a result, this Court finds that there is no evidence that defendant acted in bad faith in hiring attorneys to assist with plaintiff's defense against liability claims by third parties, or to evaluate plaintiff's claim against defendant.

### vii. Continuing Duty to Investigate

Plaintiff argues that defendant disregarded its continuing duty to investigate plaintiff's claims during the pendency of this litigation in a manner that demonstrates bad faith.  Dkt. # 107, at 35-36 However, under Oklahoma law "[o]nce a court . . . proceeding is commenced seeking insurance

benefits, normal claim handling is superseded by the litigation proceeding." <u>Andres v. Oklahoma Farm Bureau Mut. Ins. Co.</u>, 290 P.3d 15, 17 (Okla. Civ. App. 2012) (quoting Allan D. Windt, 2 Insurance Claims and Disputes 5th: Representation of Insurance Companies & Insureds, § 9:28 (March 2012)).  Accordingly, "[a]n insurer cannot be guilty of bad faith because it does not conduct its own investigation, but instead relie[s] upon its counsel to conduct an investigation that is appropriate in a litigation context." <u>Id.</u>  Because plaintiff commenced litigation, failure to investigate and either pay or deny claims made by plaintiff does not, especially without more, constitute bad faith.  Plaintiff states that the decision in <u>Andres</u> "simply does not stand for the proposition that the commencement of litigation is the cut-off date for discovery of claim file material in all instances." Dkt. # 107, at 23-24 (quoting <u>Morrison v. Chartis Prop. Cas. Co.</u>, No. 13-CV-116-JED-PJC, 2014 WL 840597, at *2 (N.D. Okla. Mar. 4, 2014), but mistakenly citing to <u>Higgins v. State Auto Property & Cas. Ins. Co.</u>, 2012 WL 2571278, *5 (N.D. Okla. July 2, 2012)).  However, that proposition of law is wholly inapplicable here.  The issue is not whether plaintiff can be precluded from discovery of material in defendant's claim file after litigation has commenced but, rather, whether investigation of a claim must be handled by an insurer during the pendency of litigation.  As a result, <u>Morrision</u> is inapplicable to this situation and <u>Andres</u> applies.  Defendant has not acted in bad faith by failing to continue investigating while litigation is pending.

### B. Failure to Investigate

In addition to plaintiff's many arguments that defendant engaged in actual bad faith conduct, resulting in the denial or delayed payment of plaintiff's claims, plaintiff also claims that defendant failed to investigate many aspects of plaintiff's claim.  Dkt. # 107, at 19-21.  "'[W]hen presented with a claim by its insured,' an insurer has a duty to 'conduct an investigation reasonably appropriate

under the circumstances . . . .'" Porter, 505 F. App'x at 793 (quoting Newport v. USAA, 11 P.3d 190, 195 (Okla. 2000)).  "Oklahoma does not require an insurer's investigation to be perfect," (id. at 794) and a mere "alleged 'failure' to further investigate cannot . . . support [a] bad faith claim." Id. (quoting Timberlake Constr. Co. v. U.S. Fid. & Guar. Co., 71 F.3d 335, 347 (10th Cir.1995)). "The investigation of a claim may in some circumstances permit one to reasonably conclude that the insurer has acted in bad faith."  Oulds, 6 F.3d at 1442; see also Bannister, 692 F.3d at 1128.

"The primary question in a bad faith claim for failure to investigate or settle a claim is: what did the insurance company know, or what should it have known at the time the insured requested payment under the applicable policy, i.e., whether the insurer had a justifiable, reasonable basis to withhold payment when the insured requested the carrier to perform its contractual obligation." Pitts v. Western American Ins. Co., 212 P.3d 1237, 1240 (Okla. Civ. App. 2009) (quotation marks omitted).  To overcome a motion for summary judgment on the issue of inadequate investigation, plaintiff "must make a showing that material facts were overlooked or that a more thorough investigation would have produced relevant information that would have delegitimized the insurer's dispute of the claim."  Bannister, 692 F.3d at 1128 (quotation marks omitted).

Plaintiff alleges that the following injuries were inadequately investigated:  i) Acute Traumatic Stress Disorder (ATSD) and Post Traumatic Stress Disorder (PTSD), ii) "future medical expenses," iii) negligent infliction of emotional distress,  iv) "diabetic reaction," v) "foreseeablity" of diabetic reaction, vi) "causation of medical injuries,"  vii) "causation of depression," viii) permanency of the left shoulder injury, ix) permanency of tinnitus injury, x) permanency of strains and sprains, xi) injuries to the right upper extremity, and  xii) loss of earning capacity.  Dkt. ## 107, at 18-21; 104, at 25-26.  The Court will address each in turn.

41

As an initial matter, in order to maintain a claim based on failure to investigate, one must have made a claim in the first place. See, e.g.,Porter v. State Farm Mut. Auto. Ins. Co., 231 P.3d 691, 693 (Okla. Civ. App. 2010) (holding that to recover under the policy an insured must "prove the existence of two simultaneous conditions precedent: 1) that he has a legal right to recover against the tortfeasor, and 2) that his claim exceeds the available liability coverage of the tort-feasor"); see also Gates v. Eller, 22 P.3d 1215, 1219 (Okla. 2001) ("[A]n injured insured must demonstrate that the preconditions for loss under the uninsured motorist coverage exist before he or she can recover under the primary uninsured motorist coverage.").

The first two claims of inadequate investigation fail for this reason. Nothing in the record demonstrates that a claim was made with respect to plaintiff's ATSD or PTSD in the November 29 demand or thereafter. While it is true defendant did not order an independent evaluation of plaintiff, plaintiff does not point to any evidence that such an examination was not ordered in bad faith to limit plaintiff's recovery. Evidence instead shows that defendant believed plaintiff's mental health to be improving after he was released from the care of a minister. Dkt. # 90-26, at 26-27. "Oklahoma does not require an insurer's investigation to be perfect; it need only be 'reasonably appropriate under the circumstances.'" Porter, 505 F. App'x at 794 (quoting Buzzard, 824 P.2d at 1109). A mere "alleged 'failure' to further investigate cannot . . . support [a] bad faith claim." Id. (quoting Timberlake, 71 F.3d at 347). Here, while a psychological examination may have resulted additional evidence of the impact of the crash on plaintiff's mental health, plaintiff does not show that payment was withheld because Wheeler or defendant believed there was more to be investigated and neglected to conduct that investigation. Further, defendant issued the second insurance payment without prejudice to plaintiff's rights under the policy. To the extent ATSD and PTSD developed

after the crash, and plaintiff can demonstrate they are causally related and compensable injuries under Oklahoma law, plaintiff was not prejudiced by accepting defendant's settlement offer of $275,000 ($25,000 liability insurance payment from Cervantes's insurance company and $250,000 in UIM compensation from defendant).

Similarly, no supporting documentation was submitted to defendant to establish plaintiff's future medical expenses. "If [plaintiff] was seeking damages for future medical, future pain and suffering, and/or disability, he would have needed expert medical testimony in support of these claims." Godfrey v. Meyer, 933 P.2d 942, 943 (Okla. Civ. App. 1996). The absence of supporting evidence of future medical expenses before the defendant, in addition to the absence of medical records establishing future care relating to plaintiff's indisputable injuries, is fatal to plaintiff's claim of bad faith inadequate investigation. See id. (stating the Oklahoma Supreme Court has found "plaintiff's own testimony competent to support an award for past pain and suffering, but not for future pain and suffering or permanent injury"). As a result, plaintiff's arguments that defendant, in bad faith, did not adequately investigate "claims" of ATSD, PTSD, or future medical expenses for injuries that defendant cannot legitimately dispute fails.

The next three claims of inadequate investigation fail for a different reason. Demonstrating that an insurer acted in bad faith based on inadequate investigation hinges on plaintiff demonstrating that an investigation would have rendered the denial of plaintiff's claim unjustified at the time denial was made. See, e.g., Pitts, 212 P.3d at 1240. Accordingly, claims for inadequate investigation are legally infirm where defendant fully performed or where no valid claim for performance exists as a matter of law. The Court notes, as discussed above, that negligent infliction of emotional distress is not a viable claim and, therefore, no amount of investigation would have required defendant's

performance.  Ball, 221 P.3d at 724.  Additionally, because defendant paid plaintiff's claim arising out of the diabetic reaction that hospitalized plaintiff, plaintiff cannot demonstrate that defendant failed to perform.  From plaintiff's brief it is not clear what he means to argue by stating the that "foreseeablity" of the diabetic reaction was not investigated.  However, to the extent plaintiff is attempting to seek damages based on plaintiff's hospitalization, the claim of inadequate investigation is without merit for the same reason: defendant performed.

The claim that defendant failed to investigate "causation of medical injuries" (Dkt. # 107, at 19-20) fails where it does not properly state a claim for inadequate investigation.  Plaintiff fails to identify with any specificity how the voluminous materials relied on to determine causation of various injuries were relied on without justification.  Without such evidence, plaintiff's claim is without merit.

In order to survive a motion for summary judgment on the remaining six claims relating to the inadequate investigation and resulting denial of benefits to plaintiff, plaintiff must show evidence that "suggests a sham defense"–i.e., that there was no legitimate dispute–or that there was "an intentional disregard of uncontrovertible facts."  Timberlake, 71 F.3d at 345.  It is not enough to state that an insurer "could have scheduled interviews with his doctors, sought narrative reports, or followed up with his health care providers to ensure that no relevant information was for whatever reason omitted from the records."  Roberts v. State Farm Mut. Auto. Ins. Co., 61 F. App'x 587, 591–92 (10th Cir. 2003).  Plaintiff must demonstrate that the insurer was not justified in relying on the information before it.  See Sims v. Great Am. Life Ins. Co., 469 F.3d 870, 893 (10th Cir. 2006) (finding no bad faith where additional "inquiry would not have changed the underlying facts upon which [insurer] was entitled to rely," such as the reports and information submitted with the claim).

Where nothing suggests the records before defendant "were incomplete or erroneously omitted discussion of possible future [] problems, . . . no reasonable jury could [conclude] that [the insurer's] investigation [was] unreasonable under the circumstances." Id.

Plaintiff argues that defendant's depression was inadequately investigated and that additional investigation would have revealed that plaintiff's depression is permanent. Dkt. # 107, at 31. However, "[w]here an insurance company has a legitimate dispute to a claim, there can be no bad faith." Pitts, 212 P.3d at 1241. In this case, defendant provides at least one dispute. Wheeler's report demonstrates that defendant believed plaintiff's depression was predominantly caused by the failure of plaintiff's business, instead of by the crash. Dkt. # 90-28, at 20. Plaintiff points to no evidence that it is unreasonable for defendant to believe plaintiff's depression was caused by his failing business, which would demonstrate that defendant's defense to liability under this claim was unjustified or a "sham defense."[12] Pitts, 212 P.3d at 1241. Therefore there was a legitimate dispute

---

[12]   Plaintiff did attach the affidavit of a non-treating physician, dated September 4, 2020, to his motion for summary judgment, in which the physician opines that plaintiff's depression was caused by the crash. Dkt. # 107-15. However, that opinion does not alter the Court's analysis for two reasons. First, the affidavit was prepared months after the close of discovery as to the bad faith claim against defendant. See Dkt. # 80 (July 24, 2020 scheduling order holding that the bad faith claim against defendant "has been pending since the June 2017 second amended petition filed in state court, and discovery should have been completed long ago. **Discovery is closed as to [that count]**.") (emphasis in original). The affidavit was also prepared after the defendant had already filed its motion for summary judgment. See Dkt. # 90 (defendant's motion for summary judgment, filed on August 18, 2020). Second, the affidavit does not refute that it was reasonable to believe that plaintiff's undiagnosed condition was related to plaintiff's business failure and so does not demonstrate that this was a "sham defense." This is especially the case when, in fact, Wheeler witnessed plaintiff's emotional response to ALK's failure when plaintiff discussed it in his examination. Dkt. # 90-26, at 33. Defendant's position that it is reasonable to believe plaintiff's depression was caused by his failing business is further supported by plaintiff's own motion for partial summary judgment, in which plaintiff states "[p]laintiff's depression was not simply based on ALK going down." Dkt. # 107, at 22 (emphasis added).

as to whether plaintiff was legally entitled to those damages.  Further, the Court questions whether a claim was ever made regarding plaintiff's depression.  Plaintiff never submitted a medical diagnosis of depression during the claims process, and all doctors' notes in plaintiff's November 29 demand indicate no depression was evident.[13]  The only evidence of depression appears to be plaintiff's lay testimony that he was depressed.  See, e.g., Dkt. # 90-13, at 7, 10, 13, 16, 18 (medical notes state "no depression," but reflect that plaintiff  "complains" of depression); see also id. at 21, 123 (medical notes state "no depression," and reflect that plaintiff does not complain of depression).

Defendant has also shown legitimate disputes exist as to whether plaintiff is owed any additional compensation based on the permanency of his left shoulder injury.  First, Wheeler's report reflects that he considered the total future compensation available for this injury in its calculation, as evidenced by his consideration of the jury verdicts he reviewed and his experience in settling operated-shoulder cases.  Dkt. # 90-28, at 19, 21, 74-91.  Second, defendant disputes whether plaintiff's ongoing left shoulder difficulties are compensable under Oklahoma law to the extent that plaintiff appeared to reinjure his left shoulder after his surgery.  Dkt. # 90-13, at 20.  Prior to the reinjury, plaintiff reported being pain free.  Id.  Plaintiff has not adequately shown that such reinjury did not occur or did not cause the problems that plaintiff still experiences, in order to show that defendant's reliance on medical testimony is a "sham defense."  Pitts, 212 P.3d at 1241.

---

[13]     Under these facts, the Court finds it difficult to accept the proposition that plaintiff's depression is "permanent."  To date, plaintiff still has not provided any evidence that he sought treatment of any kind for depression, apart from seeing a minister in 2017.  Further, any continuing allegations that plaintiff did not have adequate funds to obtain a diagnosis or treatment are similarly not credible where plaintiff received a sizeable payment after his March 2017 testimony and has also retained numerous litigation experts in this matter.

Similarly, defendant has also shown legitimate disputes exist as to whether plaintiff is owed any additional compensation based on the permanency of his tinnitus injury and permanency of strains and sprains.  The medical evidence presented to defendant at the time reflected that such injuries were related to the crash, and the defendant paid the claimed medical bills for those injuries. As to the future impact of tinnitus, defendant reviewed medical records that indicated the condition was post-concussive and would likely resolve in time.  Dkt. # 90-13, at 79-81 (doctor's notes attributing tinnitus to hearing loss and/or possible concussion and stating that it "hopefully over time this will show improvement if it is post-concussive").  While plaintiff testified in his March 29, 2017 examination that his tinnitus had not improved (Dkt. # 90-26, at 13), Wheeler noted in his compensation evaluation that it was not greatly impacting plaintiff's life.  Dkt. # 90-28, at 20.  As to the permanency of sprains and strains, defendant accepted Wheeler's determination that plaintiff still suffers from certain issues, but that they would likely continue to improve, as some had since the crash.  Alternately, Wheeler also found that a jury would not likely find additional treatment was necessary beyond a certain time frame was necessary.  Id. at 16.  Plaintiff did not submit evidence supporting the medical necessity of future treatment for those injuries and no mention of it was made in plaintiff's medical records.

Additionally, defendant has shown legitimate disputes exist as to whether plaintiff is owed any additional compensation based on the injuries to the right upper extremity that plaintiff has not demonstrated are unjustified or unreasonable.  Specifically, plaintiff has not shown that it was unreasonable to conclude that the peripheral neuropathy, and carpal and cubital tunnel syndromes, were the result of plaintiff's diabetes.  These reasonable conclusions were based on the diagnosis of plaintiff's doctor attributing plaintiff's symptoms to his diabetes.  Id. at 20.  Defendant's reliance on

that diagnosis is well-founded where the doctor that attributed the issues in plaintiff's right upper extremity to plaintiff's diabetes was the same doctor who treated him after the March 9 accident for his left shoulder.

Finally, plaintiff's claim that inadequate investigation led to the bad faith denial of plaintiff's claim of loss of earning capacity also lacks supporting bad faith evidence. In his examination, plaintiff testified that he felt he could return to work in February 2017 and that he was looking for jobs. Dkt. # 90-26, at 49. He made no indication that he believed he could return to work only part time. Additionally, no medical evidence submitted, or in existence at the time, indicated plaintiff had limitations with respect to his ability to work. In fact, it is apparent that plaintiff was planning to go back to work full-time based on his representation that he did not believe he could not find a job prior to March 2017 because he was still seeing a chiropractor twice a week. That plaintiff now presents the September 4, 2020 affidavit (see footnote 12), indicating that plaintiff would not be able to work full time due to mental health issues, does not alter the analysis that, at the time performance was requested, those limitations were not known by plaintiff and therefore not reasonably knowable by defendant. Further, defendant was permitted to rely on plaintiff's own representation in March 2017 that he could work, in determining that there was no impairment of earning capacity.

Because plaintiff failed to submit evidence demonstrating defendant acted in bad faith, the Court finds defendant's motion for summary judgment on the bad faith claim should be granted. Further, as there was no bad faith, plaintiff's claim for punitive damages necessarily fails.

## IV.

Plaintiff and defendant have filed numerous motions to exclude certain evidence (Dkt. ## 53, 103, 117, 118, 119, 120, 121, 122, 124). With one notable exception, the Court finds the materials

addressed in those motions do not implicate the Court's rationale for granting summary judgment to defendant.  Accordingly, they are mooted by this opinion and order.  The sole exception is plaintiff's motion to strike expert opinions set forth in defendant's response to plaintiff's motion for partial summary judgment (Dkt. # 135).  For the reasons detailed below, this motion is denied.

In his motion, plaintiff asserts three propositions: that defendant should not be able to argue that any condition plaintiff ever suffered is a pre-existing condition; that defendant should be precluded from offering new defense theories not relied on when assessing the claim; and that neither Wheeler nor plaintiff are "experts or are qualified to give either medical or financial opinions," so their testimony must be stricken.

As the Court does not address plaintiff's medical treatments prior to the crash, the first proposition is moot.  Next, plaintiff contends defendant should be precluded from offering new defense theories not relied on at the time the claim was being evaluated.  Dkt. # 135, at 25-26. Plaintiff states that defendant cannot argue that plaintiff did not properly make a UIM claim under the policy in order to excuse the delay of the UIM claim investigation from the date of the accident to December 2016.  The Court finds that the motion to strike is without merit.  The notice requirements in the policy, known to both parties, were not complied with until November 29, 2016. That defendant's employees would have guided plaintiff through the process of complying with those requirements had they known plaintiff was attempting to make a claim does not foreclose them from reasonably relying on the fact that, under the contract, defendant expected some notice of a UIM claim before opening an investigation.

Second, plaintiff argues defendant cannot point to plaintiff's reinjury of his left shoulder, which is reflected in the medical records, as evidence of a legitimate dispute because it is a "new

defense." Id. at 26. The record reflects Wheeler knew about the fall and questioned plaintiff about it. Dkt. # 90-26, at 21. He also emphasized the medical opinion that discusses the fall in his initial report to Graham (Dkt. # 90-16, at 26) and his final report (Dkt. # 90-28, at 7-8). Because it was clearly part of his investigation of the claim, arguments relating to that information are not excludable on the basis that they are a "new defense."

Finally, plaintiff argues that plaintiff's testimony about his own injuries, and Wheeler's testimony about the conclusions he reached after review of the plaintiff's financial and medical records, should be stricken as impermissible expert witness testimony pursuant that was not disclosed pursuant to Federal Rule of Civil Procedure 26. Dkt. # 135, at 24. As an initial matter, plaintiff's testimony about his past injuries is admissible. Godfrey, 933 P.2d at 943 (describing the Oklahoma Supreme Court's holding in Reed v. Scott, 820 P.2d 445 (Okla. 1991), in which that court found "plaintiff's own testimony competent to support an award for past pain and suffering, but not for future pain and suffering or permanent injury"). Plaintiff's testimony regarding both objective and subjective injuries is admissible. Id. at 944 (finding "it is no longer the law that the mere fact an injury is subjective necessarily means expert testimony is required to prove the injury's cause. . . . [A] plaintiff may, under appropriate circumstances, establish a prima facie case for past medical expense and pain and suffering without the necessity of a medical expert."). Accordingly, to the extent the motion seeks to exclude plaintiff's testimony regarding his own past injuries, the motion is denied. Plaintiff can testify to the extent and nature of his injuries.

Plaintiff also seeks to exclude Wheeler's testimony as to "the permanency of left shoulder, sprain/strain, the nature, extent and causation of depression and plaintiff's earning claim for loss of earning capacity." Dkt. # 135, at 24. In support of that motion, plaintiff cites two cases that hold

expert testimony is required to establish future pain and suffering and that certain injuries require medical experts to determine "the cause and extent of those injuries." Id. at 25.

Under Federal Rule of Civil Procedure 26(a)(2), "a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." Fed. R. Civ. P. 26(a)(2). The disclosure must also be accompanied by a written report if "the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." Fed. R. Civ. P. 26(a)(2)(B). However, "[w]here an expert witness has 'formed his opinions in the normal course of his work,' instead of being 'asked to reach an opinion in connection with specific litigation,' the expert is not subject to Rule 26(a)(2)(B)." Turner v. Phillips 66 Co., No. 18-CV-00198-GKF-FHM, 2019 WL 1434659, at *2 (N.D. Okla. Mar. 29, 2019), aff'd, 791 F. App'x 699 (10th Cir. 2019) (quoting Mlsna v. Union Pac. R.R. Co., No. 18-CV-37-WMC, 2019 WL 316743, at *2 (W.D. Wis. Jan. 24, 2019), and B.H. ex rel. Holder v. Gold Fields Mining Co., No. 04-CV-0564-CVE-PJC, 2007 WL 128224, at *3 (N.D. Okla. Jan. 11, 2007)). "[A]n investigator who intends to offer expert testimony regarding the subject of an investigation he conducted is not 'retained or specially employed' for purposes of Rule 26(a)(2)(B)." Huffman v. City of Conroe, Texas, No. CV H-07-1964, 2008 WL 11391360, at *1 (S.D. Tex. July 10, 2008); Fed. R. Civ. P. 26, cmt to 1970 amend. ("It should be noted that the subdivision does not address itself to the expert whose information was not acquired in preparation for trial but rather because he was an actor or viewer with respect to transactions or occurrences that are part of the subject matter of the lawsuit. Such an expert should be treated as an ordinary witness."). Accordingly, regardless of the testimony Wheeler offers on the matter, it is not excludable for the sole failure to provide an expert report.

To the extent plaintiff argues Wheeler's testimony as a non-retained medical or financial expert must be excluded, the Court agrees.  Wheeler should not be permitted to diagnose plaintiff or offer views on the future medical expenses and permanency of plaintiff's injuries.  He also should not be able to testify as to his opinion of plaintiff's future earning potential.  However, to the extent his decisions on valuation of the claim were based on review of medical diagnoses, and a retained CPA to assist in review of financial records, his role of an investigator does qualify him as a lay witness to the investigation of plaintiff's claim and therefore the subject of this lawsuit.

Wheeler will be permitted to testify as a lay witness to his investigation and his findings as the person hired to assess plaintiff's UIM claim.   Under Federal Rule of Evidence 701:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> > (a) rationally based on the witness's perception;
> >
> > (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
> >
> > (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701.  "The critical dividing line between skilled lay witnesses and expert witnesses is personal knowledge. While expert witnesses may opine on hypotheticals and provide general insights into technical or other specialized matters, lay witnesses must usually limit their testimony to opinions arising from their perceptions of the subject matter at issue." Encompass Ins. Co. v. Berger, No. CV128294MWFPJWX, 2013 WL 12124281, at *4 (C.D. Cal. Dec. 10, 2013).  "Lay witnesses may, however, testify to conclusions and opinions based on a combination of their personal observations of the subject matter at issue and skills, knowledge, or experience obtained through

their vocation." Id. at *3.  Here, Wheeler was not hired to reach an opinion to be presented before a court for litigation.  Instead, he was hired after plaintiff submitted his November 29 demand to assist with the investigation of the claim. His opinions, formed in the normal course of his work, were based on diagnoses and notes from medical professionals and financial analysis from a financial professional.  To the extent plaintiff seeks to exclude the testimony of Wheeler that covers his investigation, plaintiff's motion is denied.  In those matters, Wheeler is a fact witness as to defendant's investigation and valuation of plaintiff's claim.  For those reasons, the Court finds neither plaintiff nor Wheeler is an expert subject to the Rule 26 requirements and as a result the motion to exclude their testimony on that basis is denied.

**IT IS THEREFORE ORDERED** that defendant's motion for summary judgment (Dkt. # 90) is **granted**, and plaintiff's motion for partial summary judgment (Dkt. # 107) is **denied**. Plaintiff's motion to strike expert opinions set forth in defendant's response to plaintiff's motion for summary judgment (Dkt. # 135) is **denied**.

**IT IS FURTHER ORDERED** that all other motions to exclude evidence (Dkt. ## 53, 103, 117, 118, 119, 120, 121, 122, and 124) are **moot**.

**IT IS FURTHER ORDERED** that a separate judgment is entered herewith.

**DATED** this 3rd day of March, 2021.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE